IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CYBERFONE SYSTEMS, LLC )
)
      Plaintiff, )
)
v. ) Civ. No. 14-1489-SLR
)
LEXMARK INTERNATIONAL, INC. )
)
      Defendant. )

---

Richard D. Kirk, Esquire, Stephen B. Brauerman, Esquire, Vanessa R. Tiradentes, Esquire, Sara E. Bussiere, Esquire of Bayard P.A., Wilmington, Delaware. Counsel for Plaintiff.

Steven J. Balick, Esquire, Tiffany Geyer Lydon, Esquire and Andrew C. Mayo, Esquire of Ashby & Geddes, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Timothy C. Meece, Esquire, V. Bryan Medlock, Esquire, Jason S. Shull, Esquire, Michael Harris, Esquire and Audra Eidem Heinze, Esquire of Banner & Witcoff LTD.

---

**MEMORANDUM OPINION**

Dated: October 8, 2015
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On February 21, 2014, plaintiff CyberFone Systems LLC ("plaintiff") filed the instant patent infringement action against defendant Lexmark International Inc. ("defendant") alleging infringement of U.S. Patent No. 6,044,382 ("the '382 patent") in the Eastern District of Texas. (D.I. 1) On December 17, 2014, the action was transferred to the District of Delaware. (D.I. 23; D.I. 24) Presently before the court is defendant's motion for judgment on the pleadings. (D.I. 36) The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## II. BACKGROUND

Plaintiff is a Texas limited liability company with its principal place of business in Longview, Texas. Defendant is a Delaware corporation with its principal place of business in Lexington, Kentucky. (D.I. 1) The '382 patent, titled "Data Transaction Assembly Server," was filed on June 20, 1997 and issued on March 28, 2000.

## III. STANDARD OF REVIEW

When deciding a Rule 12(c) motion for judgment on the pleadings, a district court must view the facts and inferences to be drawn from the pleadings in the light most favorable to the non-moving party. *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 220 (3d Cir. 2001); *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 406 (3d Cir. 1993). The motion can be granted only if no relief could be afforded under any set of facts that could be provided. *Turbe v. Gov't of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991); *see also Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 891 (D. Del. 1991); *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Ctr.*, 536

F. Supp. 1065, 1072 (E.D. Pa. 1982) ("If a complaint contains even the most basic of allegations that, when read with great liberality, could justify plaintiff's claim for relief, motions for judgment on the pleadings should be denied."). However, the court need not adopt conclusory allegations or statements of law. *In re General Motors Class E Stock Buyout Sec. Litig.*, 694 F. Supp. 1119, 1125 (D. Del. 1988). Judgment on the pleadings will only be granted if it is clearly established that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988).

## IV. DISCUSSION

### A. 35 U.S.C. § 101

Section 101 provides that patentable subject matter extends to four broad categories, including: "new and useful process[es], machine[s], manufacture, or composition[s] of matter." 35 U.S.C. § 101; *see also Bilski v. Kappos*, 561 U.S. 593, 601 (2010) ("*Bilski II*"); *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). A "process" is statutorily defined as a "process, art or method, and includes a new use of a known process, machine manufacture, composition of matter, or material." 35 U.S.C. § 100(b). The Supreme Court has explained:

> A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence.

*Diamond v. Diehr*, 450 U.S. 175, 182-83 (1981) (internal quotations omitted).

2

The Supreme Court recognizes three "fundamental principle" exceptions to the Patent Act's subject matter eligibility requirements: "laws of nature, physical phenomena, and abstract ideas." *Bilski II*, 561 U.S. at 601. In this regard, the Court has held that "[t]he concepts covered by these exceptions are 'part of the storehouse of knowledge of all men ... free to all men and reserved exclusively to none.'" *Bilski II*, 561 U.S. at 602 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)). "[T]he concern that drives this exclusionary principle is one of pre-emption," that is, "'that patent law not inhibit further discovery by improperly tying up the future use of' these building blocks of human ingenuity." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, — U.S. —, 134 S.Ct. 2347, 2354 (2014) (citing *Bilski II*, 561 U.S. at 611-12 and *Mayo Collaborative Servs.v. Prometheus Labs., Inc.*, 566 U.S. —, 132 S.Ct. 1289, 1301 (2012)).

Although a fundamental principle cannot be patented, the Supreme Court has held that "an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection," so long as that application would not preempt substantially all uses of the fundamental principle. *Bilski II*, 561 U.S. at 611 (quoting *Diehr*, 450 U.S. at 187) (internal quotations omitted); *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) ("*Bilski I*"). The Court has described the

> framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts. First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. We have described step two of this analysis as a search for an "'inventive concept'"—i.e., an element or combination of elements that is "sufficient to

3

ensure that the patent in practice amounts to significantly more than a
patent upon the [ineligible concept] itself."

*Alice*, 134 S.Ct. at 2355 (citing *Mayo*, 132 S.Ct. at 1294, 1296-98).[1]

"[T]o transform an unpatentable law of nature into a patent-eligible application of such a law, one must do more than simply state the law of nature while adding the words 'apply it.'" *Mayo*, 132 S.Ct. at 1294 (citing *Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972)) (emphasis omitted). It is insufficient to add steps which "consist of well-understood, routine, conventional activity," if such steps, "when viewed as a whole, add nothing significant beyond the sum of their parts taken separately." *Mayo*, 132 S. Ct. at 1298. "Purely 'conventional or obvious' '[pre]-solution activity' is normally not sufficient to transform an unpatentable law of nature into a patent-eligible application of such a law." *Id*. (citations omitted). Also, the "prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant post-solution activity.'" *Bilski II*, 561 U.S. at 610-11 (citation omitted). For instance, the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S.Ct. at 2358. "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides

---

[1] The machine-or-transformation test still may provide a "useful clue" in the second step of the *Alice* framework. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (citing *Bilski II*, 561 U.S. at 604 and *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012). A claimed process can be patent-eligible under § 101 if: "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *Bilski I*, 545 F.3d at 954, aff'd on other grounds, *Bilski II*, 561 U.S. 593.

4

any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (citations omitted).

Because computer software comprises a set of instructions,[2] the first step of *Alice* is, for the most part, a given; i.e., computer-implemented patents generally involve abstract ideas. The more difficult part of the analysis is subsumed in the second step of the *Alice* analysis, that is, determining whether the claims "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," or whether the claims are directed to "a problem specifically arising in the realm of computer technology" and the claimed solution specifies how computer technology should be manipulated to overcome the problem. *DDR Holdings, LLC v. Hotels.Com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).

In *DDR*, for example, the claims at issue involved computer technology directed at retaining website visitors.[3] In its analysis, the Federal Circuit rejected the notion that the pre-Internet analog to the claims at issue ended the inquiry, explaining that while

---

[2] Or, to put it another way, software generally comprises a method "of organizing human activity." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367-68 (Fed. Cir. 2015) (citing *Alice*, 134 S.Ct. 2351-52, and *Bilski II*, 561 U.S. at 599).
[3] In *DDR*, representative claim 19 of the '399 patent recites:

> A system useful in an outsource provider serving web pages offering commercial opportunities, the system comprising:
> (a) a computer store containing data, for each of a plurality of first web pages, defining a plurality of visually perceptible elements, which visually perceptible elements correspond to the plurality of first web pages;
> (i) wherein each of the first web pages belongs to one of a plurality of web page owners;
> (ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and

5

the "store within a store" concept . . . may have been well-known by the relevant time frame, that practice did not have to account for the ephemeral nature of an Internet "location" or the near-instantaneous transport between these locations made possible by standard Internet communication protocols, which introduces a problem that does not arise in the "brick and mortar" context.

773 F.3d at 1258. In other words, "[a]lthough the claims address[ed] a business challenge . . ., it [was] a challenge particular to the Internet." *Id.* at 1257. The Court concluded that, under any of the characterizations of the abstract idea, the claims satisfied step two of *Alice* as being

> different enough in substance from those in *Ultramercial* because they do not broadly and generically claim "use of the Internet" to perform an abstract business practice (with insignificant added activity). Unlike the claims in *Ultramercial*, the claims at issue here specify how interactions with the Internet are manipulated to yield a desired result – a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink. . . .
>
> In sum, [U.S. Patent No. 7,818,399]'s claims are unlike the claims in *Alice*, *Ultramercial*, *buySAFE*, *Accenture*, and *Bancorp* that were found to be "directed to" little more than an abstract concept. To be sure, the '399

---

(iii) wherein the selected merchant, the out-source provider, and the owner of the first web page displaying the associated link are each third parties with respect to one other;
  (b) a computer server at the outsource provider, which **computer server** is coupled to the computer store and **programmed to**:
    (i) receive from the web browser of a computer user a signal indicating activation of one of the links displayed by one of the first web pages;
    (ii) automatically identify as the source page the one of the first web pages on which the link has been activated;
    (iii) in response to identification of the source page, automatically retrieve the stored data corresponding to the source page; and
    (iv) using the data retrieved, automatically generate and transmit to the web browser a second web page that displays:
      (A) information associated with the commerce object associated with the link that has been activated, and
      (B) the plurality of visually perceptible elements visually corresponding to the source page.

773 F.3d at 1249-50 (emphasis added).

6

> patent's claims do not recite an invention as technologically complex as an
> improved, particularized method of digital data compression. But nor do
> they recite a commonplace business method aimed at processing
> business information, applying a known business process to the particular
> technological environment of the Internet, or creating or altering
> contractual relations using generic computer functions and conventional
> network operation, such as the claims in *Alice, Ultramercial, buySAFE,
> Accenture,* and *Bancorp.*

*Id.* at 1258-59 (citing *Alice,* 134 S.Ct. at 2359; *Ultramercial,* 772 F.3d 709, 714-16 (Fed. Cir. 2014); *buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350, 1355 (Fed. Cir. 2014); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.,* 728 F.3d 1336, 1344-45 (Fed. Cir. 2013); *Bancorp,* 687 F.3d at 1277-78); *but see Dealertrack, Inc. v. Huber,* 674 F.3d 1315, 1331-35 (Fed. Cir. 2012).

In *DDR*, the analytical framework (in the context of computer-implemented inventions) was articulated so as to require that the inventive concept "recite a specific way" to solve a "particular Internet-centric problem," with the claimed solution being "necessarily rooted in computer technology," so that the result "is not merely the routine or conventional use of the Internet." 773 F.3d at 1257, 1259. Since providing that explanation, the Federal Circuit has not preserved the validity of any other computer-implemented invention under § 101.[4] For instance, in *Intellectual Ventures*, a case that also presented claims directed at websites,[5] the Court explained that, "[a]t step one of

---

[4] *See, e.g., Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,* 776 F.3d 1343 (Fed. Cir. 2014); *Allvoice Devs. US, LLC v. Microsoft Corp.,* Civ. No. 2014-1258, 2015 WL 2445055, — Fed. Appx. — (Fed. Cir. 2015); *OIP Techs., Inc. v. Amazon.com, Inc.,* 788 F.3d 1359 (Fed. Cir. 2015); *Internet Patents Corp. v. Active Network, Inc.,* 790 F.3d 1343 (Fed. Cir. 2015); *Intellectual Ventures,* 792 F.3d 1363; *Versata Dev. Grp., Inc. v. SAP America, Inc.,* 793 F.3d 1306 (Fed. Cir. 2015).
[5] Representative claim 1 of U.S. Patent No. 7,603,382 recites:

> A system for providing web pages accessed from a web site in a manner
> which presents the web pages tailored to an individual user, comprising:

the *Alice* framework, it is often useful to determine the breadth of the claims in order to determine whether the claims extend to cover a "'fundamental . . . practice long prevalent in our system.'" *Intellectual Ventures*, 792 F.3d at 1369 (citing *Alice*, 134 S. Ct. at 2356). The Court characterized the claims at issue as relating to "customizing information based on (1) information known about the user and (2) navigation data." *Id.* Likening "[t]his sort of information tailoring" to "providing different newspaper inserts based upon the location of the individual," *id.*, the Court concluded that the first aspect of the inventive concept was an abstract idea. The second aspect of the inventive concept, using "navigation data (i.e., information relating to when the user navigated to the website) to 'customize' the website," *id.*, the Court again concluded that "[t]ailoring information based[, e.g.,] on the time of day of viewing is also an abstract, overly broad concept long-practiced in our society." *Id.* at 1370.[6]

---

> an interactive interface configured to provide dynamic web site
> navigation data to the user, the interactive interface comprising:
> a display depicting portions of the web site visited by the user as a
> function of the web site navigation data; and
> a display depicting portions of the web site visited by the user as a
> function of the user's personal characteristics.

*Intellectual Ventures*, 792 F.3d at 1368.
[6] In this regard, the observation made by the district court in *Paone v. Broadcom Corp.*, Civ. No. 15-0596, 2015 WL 4988279 (E.D.N.Y. Aug. 19, 2015), is worth noting, that (in the context of encryption technology) it was of

> no moment that "[e]ncryption, in general, represents a basic building block
> of human ingenuity that has been used for hundreds, if not thousands, of
> years." That is because [U.S. Patent No. 6,259,789] does not claim a
> process that can or does involve the encryption of data for some purpose
> that is otherwise abstract. Rather, it claims a specific method of doing so.

*Id.* at *7 (citation omitted) (emphasis omitted).

Turning to the second step of *Alice*, the *Intellectual Ventures* Court concluded that the claims at issue presented no inventive concept "that would support patent eligibility."[7] *Id.* at 1370. The Federal Circuit explained:

> Steps that do nothing more than spell out what it means to "apply it on a computer" cannot confer patentability. . . . Requiring the use of a "software" "brain" "tasked with tailoring information and providing it to the user" provides no additional limitation beyond applying an abstract idea, restricted to the Internet, on a generic computer.

*Id.* at 1370-71. In distinguishing *DDR*, the *Intellectual Ventures* Court offered the following analysis:

> The patent at issue in [*DDR*] dealt with a problem unique to the Internet: Internet users visiting one web site might be interested in viewing products sold on a different web site, but the owners of the first web site did not want to constantly redirect users away from their web site to a different web site. . . . The claimed solution used a series of steps that created a hybrid web page incorporating "look and feel" elements from the host web site with commerce objects from the third-party web site. . . . The patent at issue in *DDR* provided an Internet-based solution to solve a problem unique to the Internet that (1) did not foreclose other ways of solving the problem, and (2) recited a specific series of steps that resulted in a departure from the routine and conventional sequences of events after the click of a hyperlink advertisement. . . . The patent claims [in *Intellectual Ventures*] do not address problems unique to the Internet, so *DDR* has no applicability.[8]

*Id.* at 1371 (citations omitted).

In reviewing post-*Alice* cases such as *DDR* and *Intellectual Ventures*, the court is struck by the evolution of the § 101 jurisprudence, from the complete rejection of

---

[7] Despite the "dynamic presentation of data – that is, . . . the claimed invention in 'real time' customizes the web page based on the information it knows about the particular viewer" – and despite the claimed "interactive interface," which was "broadly construed by the district court to mean 'a selectively tailored medium by which a web site user communicates with a web site information provider.'" *Intellectual Ventures*, 792 F.3d at 1369-70.

[8] But recall the "store within a store" pre-Internet analog rejected in *DDR*.

patentability for computer programs[9] to the almost complete acceptance of such,[10] to the current (apparent) requirements that the patent claims in suit (1) disclose a problem "necessarily rooted in computer technology," and (2) claim a solution that (a) not only departs from the "routine and conventional" use of the technology, but (b) is sufficiently specific so as to negate the risk of pre-emption. *See DDR*, 773 F.3d at 1257; *Intellectual Ventures*, 792 F.3d at 1371. In other words, even though most of the patent claims now being challenged under § 101 would have survived such challenges if mounted at the time of issuance, these claims are now in jeopardy under the heightened specificity required by the Federal Circuit post-*Alice*. Moreover, it is less than clear how a § 101 inquiry that is focused through the lens of specificity can be harmonized with the roles given to other aspects of the patent law (such as enablement under § 112 and non-obviousness under § 103),[11] especially in light of the Federal

---

[9] *See, e.g.*, 33 Fed. Reg. 15581, 15609-10 (1968), and Justice Steven's dissent in *Diehr*, whose solution was to declare all computer-based programming unpatentable, 450 U.S. at 219.

[10] *State Street Bank & Trust Co. v. Signature Fin. Group, Inc.*, 149 F.3d 1368 (Fed. Cir. 1998), *abrogated by Bilski I*, in which "a computer-implemented invention was considered patent-eligible so long as it produced a 'useful, concrete and tangible result.'" *DDR*, 773 F.3d at 1255 (citing *State Street Bank*, 149 F.3d at 1373).

[11] Indeed, Judge Plager, in his dissent in *Dealertrack*, suggested that,

> as a matter of efficient judicial process I object to and dissent from that part of the opinion regarding the '427 patent and its validity under § 101, the section of the Patent Act that describes what is patentable subject matter. I believe that this court should exercise its inherent power to control the processes of litigation . . ., and insist that litigants, and trial courts, initially address patent invalidity issues in infringement suits in terms of the defenses provided in the statute: "conditions of patentability," specifically §§ 102 and 103, and in addition §§ 112 and 251, and not foray into the jurisprudential morass of § 101 unless absolutely necessary.

*Dealertrack*, 674 F.3d at 1335. *But see CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1277 (Fed. Cir. 2013), *aff'd*, 134 S. Ct. 2347 (2014).

Circuit's past characterization of § 101 eligibility as a "coarse" gauge of the suitability of broad subject matter categories for patent protection. *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010). Given the evolving state of the law, the § 101 analysis should be, and is, a difficult exercise.[12] At their broadest, the various decisions of the Federal Circuit[13] would likely ring the death-knell for patent protection of computer-implemented inventions,[14] a result not clearly mandated (at least not yet). On the other hand, to recognize and articulate the requisite degree of specificity - either in the equipment used[15] or the steps claimed[16] - that transforms an abstract idea into patent-eligible subject matter is a challenging task. In trying to sort through the various iterations of the § 101 standard, the court looks to *DDR* as a benchmark; i.e., the claims (informed by the specification) must describe a problem and solution rooted in computer technology, and the solution must be (1) specific enough to

---

[12] And, therefore, not an exercise that lends itself to, e.g., shifting fees pursuant to 35 U.S.C. § 285.

[13] *See, e.g., Dealertrack*, where the claim was about as specific as that examined in *DDR*, yet the Federal Circuit found the patent deficient because it did "not specify how the computer hardware and database [were] **specially programmed** to perform the steps claimed in the patent," 674 F.3d at 1333-34 (emphasis added). The disclosure of such programming details would likely nullify the ability of a patentee to enforce the patent, given the ease with which software can be tweaked and still perform the desired function.

[14] Ironically so, given the national concerns about piracy of American intellectual property.

[15] *See, e.g., SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010), a case where the Federal Circuit found that a GPS receiver was "integral" to the claims at issue. The Court emphasized that a machine will only "impose a meaningful limit on the scope of a claim [when it plays] a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations." *Id.* at 1333.

[16] *See, e.g., DDR*, 773 F.3d at 1257-58; *TQP Dev., LLC v. Intuit Inc.*, Civ. No. 12-180, 2014 WL 651935 (E.D. Tex. Feb. 19, 2014); *Paone*, 2015 WL 4988279.

11

preclude the risk of pre-emption, and (2) innovative enough to "override the routine and conventional" use of the computer. *DDR*, 773 F.3d at 1258-59. The pre-emption concern is generally amenable to review in the context of a motion to dismiss or for judgment on the pleadings. The second requirement, which may well involve issues of fact relating to the state of the art in the technological environment involved, is more appropriately addressed after discovery in the context of a motion for summary judgment.

## B. Claim Construction

The Federal Circuit has "never set forth a bright line rule requiring district courts to construe claims before determining subject matter eligibility." *Ultramercial, LLC v. Hulu, LLC*, 657 F.3d 1323, 1325 (Fed. Cir. 2011), vacated sub nom. *WildTangent*, 132 S.Ct. 2431 (2012). Given the gate-keeping nature of § 101, "claim construction may not always be necessary for a § 101 analysis." *Ultramercial*, 657 F.3d at 1325 (citing *Bilski II*, 561 U.S. at 611 (finding subject matter ineligible for patent protection without claim construction)). In *Bancorp*, the Federal Circuit reiterated that "claim construction is not an inviolable prerequisite to a validity determination under § 101," but it may be "desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp*, 687 F.3d at 1273-74. In advocating for judicial efficiency, the Federal Circuit recently stated:

> From a practical perspective, addressing section 101 at the outset of litigation will have a number of salutary effects. First, it will conserve scarce judicial resources. Failure to recite statutory subject matter is the sort of "basic deficiency," that can, and should, "be exposed at the point of minimum expenditure of time and money by the parties and the court," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 . . . (2007) (citations and

12

> internal quotation marks omitted). Here, for example, the district court properly invoked section 101 to dismiss Ultramercial's infringement suit on the pleadings. No formal claim construction was required because the asserted claims disclosed no more than "an abstract idea garnished with accessories" and there was no "reasonable construction that would bring [them] within patentable subject matter." *Ultramercial, LLC v. Hulu, LLC*, No. 09–CV–6918, 2010 WL 3360098, at *6 (C.D. Cal. Aug. 13, 2010).

*Ultramercial*, 772 F.3d at 718-19.

Plaintiff relies on the claim construction of the '382 patent in *Cyberfone Systems, LLC v. ZTE (USA), Inc*, Civ. No. 11-827-SLR.[17] The court construed "form driven operating system"[18] as "firmware - a set of instructions programmed on a hardware device - that, together with forms, operates to control a microprocessor without the need for a conventional operating system (such as DOS or Windows)." (Civ. No. 11-827, D.I. 360)

### C. The '382 patent

The '382 patent is directed to "a form driven operating system which permits dynamic reconfiguration of the host processor into a virtual machine which supports any of a number of operating system independent data transactions, and more particularly, to a data transaction assembly server which downloads data transactions representative of different applications." (1:13-19) The patent describes the prior art telephone/computer systems as "quite complicated and expensive" and "relatively slow." (1:50-57) The prior art systems are "not efficient for creating point-of-entry transactions in typical commercial or private settings. A point-of-entry transaction system is desired

---

[17] The court granted summary judgment of invalidity as to U.S. Patent No. 8,019,060 ("the '060 patent"). The parties then filed a joint motion to dismiss the action, without further consideration of the '382 patent.
[18] Found in claims 13 and 19.

13

which does not have such limitations and which is operating system independent." (1:60-62) More specifically, a "simplified operating system environment is desired which allows dynamic reconfiguring of the host processor for each application without requiring the programming and compilation of code at the host processor for each application." (2:56-59) The invention includes a "data transaction assembly server" ("TAS") implemented into a transaction entry device or "a personal computer or any other general purpose computer which emulates the transaction entry device." (2:65-3:5) The "form driven operating system . . . permits all data to be input as data transactions which are determined by templates (forms) tailored to each application handled by the processor." (7:15-19) "As a result, no unique user application program needs to be written for the processor when a new application is added: only the menus and forms needed for the new application need to be downloaded." (7:24-27) "Data transaction processing for a particular application specified by the menus and forms proceeds in an interactive manner until all of the desired data has been entered, transmitted, and processed." (7:36-39)

Claim 13 recites:

A method of entering data transactions into a transaction entry device comprising a microprocessor and a computer readable medium which stores a form driven operating system which controls said microprocessor to accept input data of a desired transaction type using control data comprising at least one form presented to a user by said form driven operating system for eliciting data input of said desired transaction type from said user, said at least one form including at least one prompt customized to said desired transaction type, and which stores a form/menu memory which stores said at least one form, and a transaction buffer which stores at least one data transaction to be transmitted until said at least one data transaction is ready for transmission, comprising the steps of:
    fetching a menu from said form/menu memory for use in navigating to said at least one form, said menu listing certain forms of all available

14

forms which are resident in said form/menu memory or which may be downloaded from a remote server to said form/menu memory upon user selection;

    selecting a form from said menu;

    fetching the selected form;

    initializing said transaction buffer to accept said data input of said desired transaction type in response to prompts in said selected form;

    navigating through respective prompts of said selected form and providing said data input of said desired transaction type in response to said respective prompts;

    formatting said data input in response to said respective prompts into a data transaction for processing; and

    upon completion of a data transaction including said data input in response to said respective prompts in said selected form, storing said data transaction in said transaction buffer until said data transaction is to be transmitted.

(34:6-41) Claim 19 recites:

> A data transaction processing system, comprising:
>
>     a transaction entry device comprising a microprocessor and a computer readable medium which stores a form driven operating system which controls said microprocessor to accept input data of a desired transaction type using control data comprising at least one form presented to a user by said form driven operating system for eliciting data input of said desired transaction type from said user, said at least one form including at least one prompt customized to said desired transaction type, said form driven operating system further formatting at least any data input by said user in response to said at least one prompt into a data transaction for processing, and which stores a form/menu memory which stores said at least one form;
>
>     a transmission medium; and
>
>     a server connected to said transaction entry device via said transmission medium, said server processing data transactions from said transaction entry device which include a form customized to a transaction type supported by said server, said processing performed by said server including at least one of (1) communicating said data transactions to another server for processing, and (2) processing said data transactions and returning at least one of additional forms, responses to prompts in said form customized to said transaction type supported by said server, and processed data to said transaction entry device as data transactions.

(35:13-40)

## D. Analysis

15

Applying the analytical framework of *Alice*, the court first "determine[s] whether the claims at issue are directed to one of those patent-ineligible concepts," namely, laws of nature, natural phenomena, and abstract ideas. 134 S.Ct. at 2354-55. Defendant contends that the asserted claims are directed to "a method and system of entering and processing data obtained in response to questions on forms or templates," an abstract concept that predates computers (for example, mail order catalogs and restaurant menus).[19] (D.I. 37 at 11) Plaintiff responds that claims 13 and 19 "are directed to a particular technical solution [on a specific device] that solved the technical problems associated with the prior art systems." Plaintiff also points to the court's claim construction of "form driven operating systems" as not requiring a "conventional operating system" to argue that the "form driven operating system" cannot be abstract. (D.I. 41 at 11-13)

Claim 13 recites "[a] method of entering data transactions into a transaction entry device comprising a microprocessor and a computer readable medium which stores a form driven operating system . . . ." The system claim 19 similarly recites "a transaction entry device comprising a microprocessor and a computer readable medium which stores a form driven operating system . . . ." The focus at step one of the *Alice* analysis is the purpose of the claims, here, entering and processing data in response to questions on forms or templates, an abstract concept. See *Dealertrack*, 674 F.3d at 1333 (finding that "the claimed process in its simplest form includes three steps: receiving data from one source, selectively forwarding the data (step B, performed

---

[19] Defendant provides a hypothetical to show a human performing the claim limitations. (D.I. 37 at 13)

16

according to step D), and forwarding reply data to the first source (step C)," therefore, "[t]he claim 'explain[s] the basic concept' of processing information through a clearinghouse."). The patent claims at issue are directed to an abstract idea.

In its discussion of step two of the Alice framework, plaintiff contends that claims 13 and 19 (the claims identified in the complaint)[20] contain several inventive concepts. "First, the claims are limited to a particular, specialized computing device that is not a general purpose computer. And second, the claims provide a specific way of using the specific claimed computing device." (D.I. 41 at 17)

The claims disclose that the "form driven operating system" "controls" a "microprocessor to accept input data" and "format" such data. The "simple firmware algorithms" contemplated by the specification to control a microprocessor, however, do not transform such microprocessor into a specialized computing device for the purpose of patent eligibility. (16:46) Neither the specification nor the claims as construed by the court require the "form driven operating system" limitation "to have any specialized firmware, hardware or processing capabilities." (D.I. 44 at 7) Nor do the claims (as informed by the specification) provide a specific way of using "the specific claimed computing device." Although the representative claims at bar disclose steps (e.g., fetching, selecting, formatting, storing), these steps represent the conventional use of a

---

[20] Plaintiff argues that any decision on claims 13 and 19 should not control the decision on the rest of the claims. Plaintiff does not point out why claims 13 and 19 are not representative, nor does plaintiff identify a claim which would compel a different result under the § 101 analysis. *See, Content Extraction*, 776 F.3d at 1348 (agreeing with the district court that certain claims were "representative, because all the claims are 'substantially similar and linked to the same abstract idea.'").

17

computer. *See Cyberfone Systems, LLC v. CNN Interactive Group, Inc.*, 558 Fed. App'x 988, 993 (Fed. Cir. 2014).

In sum, although the problem addressed by the asserted claims is rooted in computer technology, the claimed solution is not disclosed with enough specificity to transform the abstract idea (entering and processing data in response to questions on forms or templates) into a patentable application of such, thus risking monopolization of the abstract idea itself.[21] Plaintiff has not identified, and the court has not discerned, any material issue of fact that precludes entry of judgment in defendant's favor.

## V. CONCLUSION

For the foregoing reasons, the court grants defendant's motion for judgment on the pleadings. An appropriate order shall issue.

---

[21] Indeed, the '382 patent would seemingly monopolize any microprocessor programmed by firmware not requiring DOS or Windows that is capable of performing the conventional functions recited in the steps of the asserted claims. *See Alice*, 134 S. Ct. at 2354.